# DEPOSITION EXCERPTS IN SUPPORT OF PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


BRANDON LEE WHEELER                                    PLAINTIFF


VS.                     CASE NO. 4:18-cv-859-SWW


CITY OF SEARCY, ARKANSAS;                          DEFENDANTS
ERIC WEBB, INDIVIDUALLY and in his official
capacity as CHIEF OF POLICE for the CITY OF SEARCY;
MARK KIDDER, INDIVIDUALLY and in his former official
capacity as a POLICE OFFICER and INVESTIGATOR with
and for the CITY OF SEARCY; ADAM SEXTON, INDIVIDUALLY
and in his official capacity as a POLICE OFFICER and
INVESTIGATOR with and for the CITY OF SEARCY;
NICK DARNELL, INDIVIDUALLY and in his official capacity
as a POLICE OFFICER and INVESTIGATOR with and for the
CITY OF SEARCY; CHARLEY PERRY, INDIVIDUALLY and in his
former capacity as a POLICE OFFICER and INVESTIGATOR with
and for the CITY OF SEARCY; and JOHN DOES 1-20, past and
present employees of the CITY OF SEARCY or the SEARCY POLICE
DEPARTMENT



ORAL DEPOSITION

OF

NICK DARNELL

TAKEN JUNE 19, 2019, AT 2:16 P.M.


Deborah Hall, CCR

1603 Rehoboth Drive

Searcy, Arkansas 72143

(501) 230-3396
dhall1914courtreporter@gmail.com

Page 6

1          Mr. Darnell, where do you work now?

2    A    Searcy Police Department.

3    Q    How long have you worked there?

4    A    Since June of 2010.

5    Q    And what area of law enforcement or division are you in

6    here?

7    A    Criminal investigation.

8    Q    CID?

9    A    Yes, sir.

10   Q    Mr. Darnell, you and Mr. Kidder and Mr. Sexton on November

11   2nd of 2016, decided to open up the missing person case for

12   Jarrod Green.

13   A    That is correct.

14   Q    Were you prompted to open up this investigation for any

15   reason, other than having a cold case, wanting to review it?

16   A    No.

17   Q    Nobody lead you to that case file?

18   A    No, sir.

19   Q    I am going to start with Mr. Langley's statement --

20   Charles Langley, Witness 1 -- and in his initial interview

21   alleging that Mr. Wheeler offered $1,000 to get rid of Jarrod

22   Green.

23          And are you aware of the two subsequent interviews with

24   Mr. Langley?

25   A    I honestly don't remember.

                  Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)                    bc8dc811-13d7-48e7-9628-c977d0fdebaa

1    Q    You don't recall?

2    A    No, sir. I sure don't.

3    Q    There was a whole lot of discovery, so I can somewhat

4    understand that, but this is a big part of your case.

5         In the affidavit it is your first witness and you have

6    somebody saying that they have been offered money to get rid of

7    a missing person.

8         That is pretty key information, don't you think?

9    A    Yes, sir.

10   Q    You don't recall him recanting that statement in 2000?

11   A    I have read through the case file, but I would have to go

12   back to answer that correctly.

13   Q    Now, in 2016 you-all approached him and interviewed him;

14   is that correct?

15   A    Yes, sir. I do believe so.

16   Q    And he did a CVSA with you?

17   A    Yes, sir.

18   Q    What is a CVSA?

19   A    It is a computerized voice stress analysis.

20   Q    There aren't many people who can -- who are certified to

21   conduct one of those; is that safe to say?

22   A    That is safe to say.

23   Q    How many in the state are CVSA certified?

24        Do you know?

25   A    I couldn't tell you.

lectronically signed by debbie hall (301-121-347-5580)            bc8dc811-13d7-48e7-9628-c977d0fdebaa

1        I can tell you how many is certified here in this

2   department.

3   Q    How many?

4   A    Right now we have two.

5   Q    Who?

6        You and who else?

7   A    Detective Laurel Aiken.

8   Q    And I presumed you were certified; is that correct?

9   A    Yes, sir.

10  Q    And you were certified in 2016?

11  A    Yes, sir.

12  Q    What did that CVSA indicate?

13  A    Again, I don't recall.  It seems -- the best I can

14  remember that there was a little bit of deception there, which

15  lead us to believe a polygraph would clear Mr. Langley.

16  Q    CVSA is kind of the new science.  Polygraphs have been

17  around for decades; is that correct?

18  A    (witness nods head up and down)

19  Q    Why would you lean on a polygraph after a CVSA?

20  A    CVSA is just a series of nine yes or no questions, and

21  there is a little -- it monitors AM/FM frequencies in a voice

22  and produces a graph that you can look at.

23       Most of the time when we administer a CVSA, we have what

24  we call a cold call or another examiner read over the graphs --

25  the charts that it produces.

                Deborah Hall, CCR - (501)230-3396

Deborah Hall, CCR - (501)230-3396

1    A    I have never spoken with him, sir.

2    Q    You have never spoken with Mitchell?

3         You didn't go to the federal prison and do that?

4    A    No, sir.

5    Q    It doesn't sound like you were as actively involved in

6    this case as the other two.

7    A    I wasn't.

8         It is not that I didn't want to be, but, like I said, we

9    had other things going on, so I kind of helped out where I

10   could.

11        There was several interviews that I went with, but I

12   wasn't in the room during the interview, so . . .

13   Q    Do you feel the information provided in this affidavit and

14   given to the prosecutor and the judge reflects the facts as

15   you-all had them?

16   A    Yes, I do believe so.

17   Q    You don't think it is important to at least divulge other

18   information which would contradict some of this?

19   A    I think the information that was obtained through the

20   investigation lead us in the direction that we went with it.

21   I believe we had the probable cause that we needed for the

22   arrest.

23   Q    Well, the judge felt there was probable cause.  He is the

24   determining factor on that.

25        But do you feel it is appropriate to not provide the judge

Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)

bc8dc811-13d7-48e7-9628-c977d0fdebaa

Page 13

1   all the information you had when there was so much

2   contradictory evidence?

3   A    Well, I can tell you with my experience on affidavits,

4   you never put the entire case file in the affidavit.

5        You kind of got to condense.  You know, you want to --

6   Q    Cut out all of the bad stuff?

7   A    Not cut out the bad stuff, no, sir.

8        You articulate your probable cause in your affidavit, and

9   then the case file is there with the -- all of the pertinent

10  information.

11  Q    Are you aware of any evidence -- tangible evidence that

12  was ever discovered in this case since you-all started your

13  investigation in 2016?

14  A    Tangible evidence?

15  Q    Something you can touch.

16  A    There was a laptop that was provided to us.

17  Q    Who provided you the laptop?

18  A    There was -- it was actually Robert's sister.

19  Q    Robert Webb's sister --

20  A    Yes, sir.

21  Q    -- provided a laptop?

22  A    Yes, sir.

23  Q    For what reason?

24  A    It was -- it belonged to her brother, and she wanted us to

25  look into it.

                    Deborah Hall, CCR - (501)230-3396

Electronically signed by debbie hall (301-121-347-5580)                              bc8dc811-13d7-48e7-9628-c977d0fdebaa

Page 14

1    Q    Did you?

2    A    It has been sent to the secret service.

3    Q    When did that happen?

4    A    I couldn't tell you.  I don't recall.

5    Q    Was it 2016?

6    A    I don't recall.

7    Q    Why didn't you mention this laptop in your affidavit?

8    A    It came in after this was written.

9    Q    So it has been since this occurred?

10   A    Yes.

11   Q    Do you think that is the only tangible evidence that was

12   -- has been provided or discovered since you-all's

13   investigation began?

14   A    Tangible evidence?

15   Q    Tangible.

16   A    Yes, sir.

17   Q    Are you familiar with the interview with Joey Blagg?

18   A    No, sir.

19   Q    You didn't review the case file, and your are not familiar

20   with that interview?

21   A    I reviewed the case file, but I don't recall.  No, sir.

22   Q    Would it help you recollect your memory on this if I told

23   you Joey Blagg provided law enforcement information that he had

24   followed Jason Estes to Walmart and dropped off Jarrod Green's

25   vehicle?

Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)                                    bc8dc811-13d7-48e7-9628-c977d0fdebaa

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

BRANDON LEE WHEELER                                    PLAINTIFF

VS.                    CASE NO. 4:18-cv-859-SWW

CITY OF SEARCY, ARKANSAS                              DEFENDANTS
ERIC WEBB, INDIVIDUALLY and in his official
capacity as CHIEF OF POLICE for the CITY OF SEARCY;
MARK KIDDER, INDIVIDUALLY and in his former official
capacity as a POLICE OFFICER and INVESTIGATOR with
and for the CITY OF SEARCY; ADAM SEXTON, INDIVIDUALLY
and in his official capacity as a POLICE OFFICER and
INVESTIGATOR with and for the CITY OF SEARCY;
NICK DARNELL, INDIVIDUALLY and in his official capacity
as a POLICE OFFICER and INVESTIGATOR with and for the
CITY OF SEARCY; CHARLEY PERRY, INDIVIDUALLY and in his
former capacity as a POLICE OFFICER and INVESTIGATOR with
and for the  CITY OF SEARCY; and JOHN DOES 1-20, past and
present employees of the CITY OF SEARCY or the SEARCY POLICE
DEPARTMENT

ORAL DEPOSITION

OF

MARK KIDDER

TAKEN JUNE 19, 2019, AT 1:33 P.M.


Deborah Hall, CCR

1603 Rehoboth Drive

Searcy, Arkansas 72143

(501) 230-3396
dhall1914courtreporter@gmail.com

Page 6

1   Q    Well, I will begin.

2        Mr. Kidder, when did you work for the Searcy Police

3   Department?

4   A    From October of 2014 until May of 2018.

5   Q    And could you state your full name for the court.

6   A    Mark Kidder.

7   Q    And you are no longer employed with the police department?

8   A    That is correct.

9   Q    And where are you now?

10  A    I am with the Bentonville Police Department.

11  Q    What facilitated your move to Bentonville out of Searcy?

12  A    Personal reasons.

13  Q    Any of those reasons have anything to do with falsifying a

14  warrant?

15  A    Not at all.

16  Q    Have you ever been accused of falsifying a warrant?

17  A    No.

18  Q    Not by this department?

19  A    No.

20  Q    Did you and Detective Sexton and Darnell end up open --

21  reopening this investigation in November -- early November of

22  2016?

23  A    That is correct.

24  Q    What is your recollection of why you pulled Brandon

25  Wheeler's case -- or Jarrod Green's case file out?
                    Deborah Hall, CCR - (501)230-3396

Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)                    2090809f-260e-40b0-954e-1f7cb0ed08a9

Page 7

1   A    My recollection is there was two or three cold cases.

2   We were actually sitting in the office one day talking about

3   the three cold -- two or three cold cases that were within the

4   department, two of which were missing persons' cases.  We

5   decided that we would open one of the up.  We pulled his.  We

6   pulled another one.  We found that there was a lot more

7   information involved in this case that was available to us to

8   investigate, and so we started to move forward with the

9   investigation from there.

10  Q    When you say a lot more information, are you eluding to 24

11  years of investigation?

12  A    Correct.  Correct.

13  Q    There were a multitude of witnesses that had been

14  interviewed over the years; isn't that correct?

15  A    Yes.

16  Q    Recordings taken of those interviews, statements made?

17  A    Yes.

18  Q    Several detectives had worked on this case throughout the

19  years?

20  A    Correct.

21  Q    Did you help Detective Sexton craft his affidavit for

22  arrest?

23  A    I believe, honestly, that we all took part in determining

24  what probable cause we had for an affidavit.

25  Q    And were you present when the affidavit was presented to

Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)

2090809f-260e-40b0-954e-1f7cb0ed08a9

Page 8

1   Ms. McCoy?

2   A    Yes.

3   Q    In that affidavit Witness 1, it is my understanding, was

4   Charles Langely; is that correct?

5   A    That is correct.

6   Q    And Mr. Langley provided a statement on July 17th of  95,

7   as -- was reported in the affidavit of arrest?

8   A    Correct.

9   Q    Mr. Langley gave authorities two other -- at least two

10  other interviews subsequent to  95, didn't he?

11  A    He did.

12  Q    One of those in 2000?

13       Do you recall?

14  A    Without looking I can't recall.

15  Q    Maybe visited by Detective Perry and --

16  A    It is possible.

17  Q    In that interview he stated that he has done a lot of bad

18  things, but naming Brandon Wheeler and Robert Webb -- saying

19  that they had offered him $1,000 was a lie to try to avoid

20  prison time.

21       Do you recall that?

22  A    I do recall that, uh-huh.

23  Q    He said that he would have said anything to keep from

24  going to the penitentiary?

25  A    Sure.

                    Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)

2090809f-260e-40b0-954e-1f7cb0ed08a9

1    A    I am sure they probably do.

2         I don't -- but if it was not recorded -- I do remember now

3    when we went in there, they made us take every -- we had to be

4    sterile when we went in.  We had nothing in our pockets,

5    nothing like that.  I remember that now.

6    Q    Do you feel the affidavit was 100-percent accurate --

7    affidavit for Mr. Wheeler's arrest was 100-percent accurate?

8    A    I feel like we presented the probable cause that we had,

9    and that what we provided in that inter -- in that affidavit

10   was correct for what the investigation had given us.

11        Yes.

12   Q    There was a lot of contradictory evidence or statements

13   that directly contradicted what you put in the affidavit; isn't

14   that correct?

15   A    By who?

16   Q    Mr. Langley's recanted version that would contradict what

17   Witness 1 has alleged.

18        Do you think?

19   A    I think a lot of his statements are contradictory.

20        So which one do you take?

21   Q    Okay.

22        But do you just forego mentioning any contradictory

23   statements and run with the 24-year-old statement that may or

24   may not be true?

25        Is that standard operating procedure?

Electronically signed by debbie hall (301-121-347-5580)                                    2090809f-260e-40b0-954e-1f7cb0ed08a9

1   A    All we can take is what we were given.  That is all can

2   take.

3   Q    Well, you were given a lot, but you only used part of it.

4        Do you think that is appropriate?

5   A    I think what is appropriate for an affidavit is you

6   provide probable cause to have that affidavit signed off on by

7   a judge.

8        I think it is the determination of the prosecuting

9   attorney's office and that judge to determine whether or not

10  the probable cause in here is what it should be to get an

11  warrant served.

12  Q    Is it your job to determine probable cause in an

13  investigation?

14  A    We have to see if we have enough reasonable suspicion and

15  then if there is enough probable cause from that.

16       So, yes, we do make a determination of whether or not we

17  have enough to provide, because if we don't have enough to

18  provide, we can't -- we are not going to submit it.

19  Q    So is it standard to only give partial information to

20  fluff up your probable cause determination?

21  A    I think you give the probable cause that you have.

22       And especially when you work hand in hand with the

23  prosecuting attorney's office, we are not fluffing up anything.

24  Q    With all of the information that you had in this case,

25  when that affidavit for Mr. Wheeler's arrest was provided to

Electronically signed by debbie hall (301-121-347-5580)                                    2090809f-260e-40b0-954e-1f7cb0ed08a9

1  the prosecutor and the judge, how would you have felt if this

2  affidavit was on your son or family member?

3      Do you think it would be a fair affidavit?

4  A   I don't --

5          MR. OHM:   Object to the form of the question,

6          but you can answer, if you can.

7  A   I don't find that question relevant to this case

8  whatsoever.

9          MR. OHM:   In that case, you have got to answer.

10         You don't get to make that determination.

11         If he -- the question is a very poor question.

12         I will grant you that, but --

13         MR. PETTY:   Let me rephrase my question, Mr.

14         Ohm.   I am sorry.

15         MR. OHM:   Okay.

16  Q   (By Mr. Petty)  Do you feel this is a fair reflection of

17  the evidence you had at the time?

18  A   Yes.

19  Q   Do you think it is fine to leave out certain information?

20  A   When you take the totality of the information that we had,

21  and we put it into an affidavit form, I think this is

22  absolutely acceptable.

23  Q   And the totality of your evidence was what? hearsay

24  statements?

25  A   Statements that we had were from witnesses.   The

                    Deborah Hall, CCR - (501)230-3396

                Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)

2090809f-260e-40b0-954e-1f7cb0ed08a9

1   statements we had were from friends, from relatives.

2   Q    A lot of those statements were made by people who aren't

3   living anymore.

4   A    That is correct.

5   Q    One of those is Barron Stafford.

6   A    Correct.

7   Q    And in the affidavit we speak of Mr. Stafford's suicide --

8   A    Uh-huh.

9   Q    -- and his sharing with his uncle that he was involved

10  with two murders --

11  A    Correct.

12  Q    -- or two deaths; is that correct?

13       Is that a fair reflection?

14  A    Yes.

15  Q    Did you speak with Barron's uncle?

16  A    I did.

17  Q    Did he give any names of --

18  A    He could not.

19  Q    Did he give any facts behind these two alleged murders?

20  A    The only thing we consider to be facts were he gave us

21  descriptions of places that once we found those places we could

22  then say, "Okay.  He described this place to a  T'."

23       He -- this man that we talked to -- it was over the phone

24  -- he lives in Florida.  I don't know that he ever lived in

25  Arkansas.  To be honest with you, I don't know.

                    Deborah Hall, CCR - (501)230-3396

1    correct?

2    A    Correct.

3    Q    His story would account for his DNA being on Jarrod and/or

4    any weapon that may have been with Jarrod.

5         And five days after Jarrod disappears he shows up at the

6    parents' house with the wallet.

7         Is that your understanding?

8    A    That is my understanding.

9    Q    Do you believe that to be true?

10   A    I do.

11   Q    Do you-all find any of that odd?

12   A    Sure.

13   Q    A lot of circumstances there; isn't it?

14   A    Uh-huh.  Yes, sir.

15   Q    It is unfathomable to me why Mr. Hurst was never

16   interviewed by anyone.

17        Do you find that same fact being appalling to you?

18   A    I can't speak for investigators back in the  90s.  I

19   can't.

20   Q    Do you find that appalling?

21   A    If I was investigating back in the  90s, I would have

22   interviewed him.

23        Correct.

24   Q    Would have gone wherever he was to find him; is that safe

25   to say?

1    A    Yes.

2    Q    That was a big misstep in this investigation, wasn't it?

3    A    Yes.

4    Q    And it is fair to say the detectives back them dropped the

5    ball, didn't they?

6    A    I can't speak for investigators back then.  I can't.

7    Q    Just looking at the case file?

8    A    I would say there was some steps they should have taken.

9    Q    Do you know if anybody at this department was related to

10   Mr. Hurst?

11   A    I don't know that.

12   Q    Did you check into that?

13   A    I did not, no.

14   Q    It just seems suspicious why he wasn't pursued, doesn't

15   it?

16   A    One could see it that way.

17   Q    Shannon Huntsman, Witness 4 in the affidavit.

18        Ms. Huntsman claimed the night of Jarrod's disappearance

19   he called her begging her to come with him.

20   A    Yes.

21   Q    She was planning on going to Memphis with some friends; is

22   that correct?

23   A    I didn't know that that is where they were going.

24        I do know that she was going to a fair or something to

25   that sort.  I didn't know that is what it was.

Deborah Hall, CCR - (501)230-3396

ctronically signed by debbie hall (301-121-347-5580)

2090809f-260e-40b0-954e-1f7cb0ed08a9

1   didn't lead us to believe that she would be involved in that.

2       One, his car -- which was actually her car that he had

3   been using -- was found -- I don't know if she found it, or

4   somebody else found it, but it was found in the exact same

5   manner that Jarrod Green's car was found in, which lead us to

6   believe that it was probably the same person that had done it

7   with -- to Jarrod Green, so . . .

8   Q   Was that car provided to law enforcement?

9   A   If it was, it would have been with Little Rock, so . . .

10  Q   Has there been any indication that a crime has occurred in

11  regards to Robert Webb, other than he is missing?

12  A   I am not going to go into that.

13      I no longer work here.  That is a case that --

14  Q   At the time --

15  A   -- I think is actually on going, so . . .

16  Q   At the time, was there a body?

17  A   No.

18  Q   Was there a murder weapon?

19  A   Not that we knew of at the time.

20  Q   Was there a crime scene?

21  A   Not that we knew at the time.

22  Q   And I will ask you those same questions with Jarrod

23  Green's disappearance.

24      No body?

25  A   Correct.

Deborah Hall, CCR - (501)230-3396

Page 35

1   Q    No murder weapon?

2   A    Correct.

3   Q    No crime scene?

4   A    Correct.

5   Q    I am sure once law enforcement got a hold of Jarrod

6   Green's vehicle from his parents you-all looked for blood in

7   the vehicle, I am sure, wouldn't you have?

8   A    Yes.

9   Q    Did you find anything that resembled blood?

10       Did you test anything?

11       Did you send anything to the crime lab?

12  A    We never got to see that vehicle.

13  Q    You never saw -- I mean, that was I guess 24 years later.

14  A    Correct.

15  Q    So no indication that anything was ever discovered in that

16  vehicle?

17  A    Not that was in that case file.

18  Q    How many times did you interview Mitchell Johnson?

19  A    I only spoke to Mitchell one time.

20  Q    And that was at the federal prison?

21  A    Correct.

22  Q    Did he make statements to law enforcement prior to you-all

23  opening up this investigation in 2016?

24  A    To my knowledge, he did at least one time, maybe twice.

25  Q    When do you think those were?
                    Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)

2090809f-260e-40h0-954e-1f7cb0ed08a9

Page 37

1    the car at Walmart; correct?

2    A    Yes.

3         That is what we have been told.

4    Q    And is it your belief that he picked up the phone and

5    called the Greens to announce that he had found the vehicle?

6    A    The Greens said that they got a phone call from him.  He

7    claims that he made the phone call.

8         I don't know how quick that was.  I don't know the time

9    line.  I don't know.

10   Q    Jarrod Green owed a lot of people money at the time of his

11   disappearance, didn't he?

12   A    I definitely know -- I know that he owed quite a bit of

13   money.  I don't know how -- I do not know to how many people.

14   Q    Several? two?

15   A    I would say at least two, probably.

16   Q    Three?

17        How many do you know?

18   A    I know of two.

19   Q    Okay.

20   A    I know of two.

21   Q    And that would be Jason Hurst and --

22   A    And Brandon Wheeler.

23   Q    -- the alleged 6- or $7,000 to Brandon Wheeler?

24   A    Yeah.

25   Q    Do you think it is appropriate to leave exculpatory or

Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-247-5590)

1    contradictory evidence out of an affidavit that you are

2    presenting to a prosecutor and a judge?

3    A    I feel like I answered that earlier.

4         However, your probable cause is the probable cause that

5    you have for the crime that took place.  That is how you obtain

6    a warrant for someone, so . . .

7    Q    You are trying to build a case to show probable cause --

8    A    Yes.

9    Q    -- as a law enforcement officer?

10   A    Yes.

11   Q    Who determines probable cause though?

12        Is that the judge's job?

13   A    It is our job, just as -- I mean, we have to be able to

14   look at a case and say there is enough reasonable suspicion to

15   put me in this direction, and then you start building a case.

16        If there is a probable cause for it, then you can present

17   that in an affidavit form.

18        Obviously, we have to make some determination if it is

19   there or not.

20   Q    How many times did you interview Jason Hurst?

21   A    That I was involved in?  The one time that I can remember

22   and that was in Branson.

23        I don't -- there may have been a phone call.  I don't

24   remember to be honest with you.

25   Q    And even though you believe that he had that wallet and he

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

BRANDON LEE WHEELER                                      PLAINTIFF

VS.                         CASE NO. 4:18-cv-859-SWW

CITY OF SEARCY, ARKANSAS;                               DEFENDANTS
ERIC WEBB, INDIVIDUALLY and in his official
capacity as CHIEF OF POLICE for the CITY OF SEARCY;
MARK KIDDER, INDIVIDUALLY and in his former official
capacity as a POLICE OFFICER and INVESTIGATOR with
and for the CITY OF SEARCY; ADAM SEXTON, INDIVIDUALLY
and in his official capacity as POLICE OFFICER and
INVESTIGATOR with and for the CITY OF SEARCY;
NICK DARNELL, INDIVIDUALLY and in his official capacity
as a POLICE OFFICER and INVESTIGATOR with and for the
CITY OF SEARCY; CHARLEY PERRY, INDIVIDUALLY and in his
former capacity as a POLICE OFFICER and INVESTIGATOR with
and for the  CITY OF SEARCY; and JOHN DOES 1-20, past and
present employees of the CITY OF SEARCY or the SEARCY POLICE
DEPARTMENT

ORAL DEPOSITION

OF

ADAM SEXTON

TAKEN JUNE 19, 2019, AT 12:14 P.M.

Deborah Hall, CCR

1603 Rehoboth Drive

Searcy, Arkansas 72143

(501) 230-3396
dhall1914courtreporter@gmail.com

```
 1                    P R O C E E D I N G S

 2          THEREUPON,

 3                        ADAM SEXTON,

 4               THE WITNESS HERINBEFORE NAMED, having

 5               been first duly cautioned and sworn by me

 6               to testify to the truth, the whole truth,

 7               and nothing but the truth, testified on his

 8               oath as follows, to-wit:

 9                        EXAMINATION

10    BY MR. PETTY:

11    Q     It is Corporal Sexton; is that correct?

12    A     Yes, sir.

13          That is my rank.

14    Q     At one point in time you were Detective Adam Sexton; is

15    that correct too?

16    A     Yes, sir.

17    Q     What is the -- are you now in patrol, or are you now --

18    are you still in the CID?

19          What is the --

20    A     No, sir.

21          I was transferred to the patrol division in August of last

22    year and promoted to corporal in March of this year.

23    Q     Well, congratulations.

24    A     Thank you.

25    Q     Did you hear the instructions I gave Eric about yes, sir,
```

                    Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)                    2d7b61a0-b9df-459a-bb90-6f33fc3878d6

1   A    2012.

2   Q    So you have been an officer since 2012?

3   A    February of 2012.  Yes, sir.

4   Q    Seven years?

5   A    Yes, sir.

6   Q    At this time you had been an officer for -- what? -- five

7   years.

8   A    Yes, sir.

9   Q    Did you start on the traffic -- in the traffic division?

10  A    I did.

11       I worked in the traffic division from about  12 to 14,

12  and then I went to the investigation division.

13  Q    And you had been in the investigation division for how

14  long when this all -- when you started this particular

15  investigation?

16  A    I would say just over two years, I believe, if my math is

17  right.

18  Q    Would you have considered yourself the lead investigator

19  in this case?

20  A    No, sir.

21       We all started it together.  I feel like we all -- we did

22  a lot of it -- everything together.

23       My name is on the affidavit.  I do consider myself a lead

24  investigator, but I don't know that I did any more than anybody

25  else did.

                   Deborah Hall, CCR - (501)230-3396

Page 9

1    Q    Before you started, did you -- you pulled the old file

2    out, I guess; right?

3    A    Yes, sir.

4    Q    And who was the primary investigating officer in this

5    disappearance when it began?

6    A    I believe the lead investigator was Tim Webb.  When it all

7    first began, I believe it was Tim Webb.

8         I believe several detectives had some work in it, but I

9    believe Tim Webb is the first detective.

10   Q    Did you talk to Tim before you-all reopened this or

11   started this investigation?

12   A    No, sir, we did not talk to Tim.

13   Q    Did you talk to Charley Perry before you started this?

14   A    Yes, sir, we did.

15        Well, I don't know that it was before we started the

16   investigation.  I don't remember at what point we talked to

17   Charley; it was early on.

18        I don't know that we did anything before we talked to him

19   or not, so I can't say for sure.

20        But we did talk to Charley Perry, yes, sir.

21   Q    Why did you choose Charley Perry to speak to?

22   A    I don't know.

23        We had some information.  We were curious on -- of some

24   information -- some interviews he did.  We just wanted to get

25   with him and see what all he could provide us.

Deborah Hall, CCR - (501)230-3396

Deborah Hall, CCR - (501)230-3396

Electronically signed by debbie hall (301-121-347-5580)                    2d7b61a0-b9df-459a-bb90-6f33fc3878d0

Page 13

1   A    Yes.

2   Q    "-- and stated Jarrod Green had been done away with.

3   Witness One also provided details about Brandon Wheeler and his

4   roommate grabbing Jarrod Green at the Walmart Supercenter.

5   Original police report showed Jarrod Green's vehicle was found

6   at the Walmart Supercenter parking lot."

7        Now, Officer, this is the first paragraph of the affidavit

8   that you presented for the warrant of the arrest of Brandon

9   Wheeler; isn't that correct?

10  A    Yes, sir.

11  Q    And you knew when you prepared this affidavit that Charles

12  Langley had recanted that story.

13  A    Yes, sir.

14  Q    You knew that in fact he had recanted it twice.

15       One of the things that he said is that one of the great

16  remorse in his life was that he had lied about this particular

17  gentleman asking him to do away with Jarrod Green, and that he

18  would have done just about anything to avoid going to prison.

19       And you knew that?

20  A    I only recall once.  I only recall one time.  I don't --

21  Q    Well, they offered him a polygraph.

22  A    Right.

23  Q    Subsequently he was --

24  A    Okay.  Yes, sir.

25  Q    Subsequently he was offered a polygraph.  And the

Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)                                                    2d7b61a0-b9df-459a-bb90-6f33fc3878d6

Page 14

1  polygraph came back that he was telling the truth with one

2  minor deception.  And that question was, "Are you hiding

3  anything from law enforcement?"  Which is a -- hopefully we all

4  do hide something from law enforcement.

5       But you knew all of that when you put this in this

6  affidavit?

7  A    Yes, sir.

8  Q    So do you feel like that being deceptive to the court?

9  A    No, sir.

10 Q    Why not?

11 A    It was all given in the case file.  Everything -- every

12 interview we did with Charles Langley was put in the case file

13 and provided to the court.

14 Q    Provided to the judge?

15 A    Provided to the prosecuting attorney.

16 Q    Well, you sent this to the prosecuting attorney, and you

17 are relying on this to get this affidavit for Mr. Wheeler's

18 arrest.

19      And we don't bother telling in this affidavit that that

20 particular allegation had been recanted?

21 A    The prosecuting attorney was given that information.

22      We followed her guidelines and spoke with her, sent her

23 several drafts, or would have her come over here and look at

24 drafts, and we spoke with her before putting anything in this

25 affidavit.

1    A    Uh-huh.

2    Q    And that he needed the gun for protection?

3    A    Yes.

4    Q    That is why he wanted the gun back?

5    A    Yes, sir.

6    Q    Was -- does the file indicate whether Mr. Hurst was ever

7    interviewed during the initial investigation?

8    A    At first I remember thinking that it didn't, and I don't

9    remember if we ever found any documentation.

10        But I know according to Mr. Hurst he was interviewed

11   either by the Jonesboro Police Department or the FBI -- but I

12   don't know that for sure -- according to him.

13   Q    Did the Searcy Police Department ever interview him?

14   A    I don't know for sure.

15   Q    I mean, it wasn't in the file.  I never saw it.

16   A    He didn't -- I don't believe -- I believe what he told

17   us was that he had never been interviewed by Searcy Police

18   Department.

19        So it is my belief that he had not been interviewed by

20   Searcy Police Department until we did.

21        But whether or not he was and it wasn't documented, I

22   don't know.

23   Q    Who was Witness 3?

24   A    I believe that is his sister.  I believe that is going to

25   be --

Deborah Hall, CCR - (501)230-3396

Page 30

1   A    Yes, sir.

2   Q    -- because you had information that Mr. Green's body had

3   been disposed of at that location.

4   A    Yes, sir.

5   Q    Is that what you are saying?

6   A    Yes, sir.

7   Q    And then, "It was searched," you say, "due to evidence

8   found confirming information from various sources in this

9   investigation."  Okay.

10       What evidence did you find?

11  A    It was the scent of decomposing human remains.

12       I actually had a question about that myself.  We spoke

13  with the prosecuting attorney.

14       With dogs -- I had limited experience with cadaver dogs.

15  We used them once in another case.

16       But according to the prosecuting attorney, them indicating

17  that there was human decomposition is considered evidence to

18  get a search warrant.

19  Q    Well, you took the dogs out there before you got the

20  search warrant?

21  A    I don't remember that.

22  Q    Well, let's read this again, and maybe it is just a

23  Scrivener's error.

24       "The property was searched due to evidence found."

25       What evidence did you find that would have given you the

Deborah Hall, CCR - (501)230-3396

Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)          2d7b61a0-b9df-459a-bb90-6f33fc3878d6

1   Q    Go on.

2   A    I spoke with the prosecuting attorney.  She was updated

3  with everything in this case.  The prosecuting attorney

4  reviewed this case file.  She reviewed the affidavit.  We

5  seeked her advice on wording and everything, and I did not lie

6  in that affidavit.

7   Q    Well, I am not going to accuse you of lying.

8       I am going to accuse you of misleading.

9       "Due to evidence found."

10      Now, tell me what evidence you found.

11  A    The evidence I am referring to here is the scent of human

12  decomposition.

13  Q    Well, that was afterwards.

14     You got the search warrant based on evidence found

15  confirming information obtained from various sources.

16     Now, I will get into the various sources in just a minute.

17  A    Okay.

18  Q    But tell me what you found which confirmed any of the

19  various sources.

20     What did you find?

21  A    I don't know, sir.

22     I would need to review my notes.

23  Q    This is pretty important in this investigation.

24     You found some evidence out there.  You-all actually get a

25  search warrant, and you go dig out a pond.

1   Q     That Bobby O'Brien received information from various

2   sources --

3   A     Various sources, no, sir.

4   Q     One source?

5   A     According to Bobby O'Brien.  Yes, sir.

6   Q     Did you have any other sources indicating the property had

7   been dumped out there on this property that you-all got a

8   warrant for?

9   A     I know we had one other source for sure and that would be

10  Riley Daves, but I can't remember when I spoke with Riley about

11  that.  And I can't remember the other sources.  No, sir.

12        But --

13  Q     What did you send to the crime lab?

14  A     It was what we thought was a piece of cloth.

15        It looked like it had blood on it and it was the only

16  thing like that out there.  It was the same -- I believe it was

17  the same color of some clothing that Jarrod had on when he went

18  missing.  And we thought it was -- we actually thought it was a

19  piece of cloth.  It turned out to be a plant of some sort.

20  Q     A plant?

21  A     Yes, sir.

22        And I don't remember -- I know there had to be -- there

23  might have been a few things that we sent out that we found out

24  there, but I can't remember what they were.

25  Q     Did you find any human remains?

Deborah Hall, CCR - (501)230-3396

1   A   No, sir.

2   Q   Did you ask for DNA on anything?

3   A   We might have requested DNA.

4   Q   On the plant?

5   A   I think so, but I couldn't tell you for sure, sir.

6   Q   This is all back in December.

7       When did you actually execute the search warrant?

8   A   I believe the first search warrant was in December.

9   Q   And that is when you found the plant out there?

10  A   No, sir.

11      I don't remember what -- I know we dug, but I don't

12  remember what we found exactly, or if we --

13  Q   Was that before the cadaver dogs or after the cadaver

14  dogs?

15  A   We used cadaver dogs there, sir.

16  Q   Who was in charge of the cadaver dogs?

17  A   We were.

18  Q   Who is trained to handle the cadaver dog --

19  A   Oh, in charge of the cadaver dogs.  I am sorry.

20      We used Search Paws South, I believe.

21  Q   Who?

22  A   Search Paws South.

23      I don't know -- I don't remember their names -- their

24  first names.

25  Q   What did we pay for the use of the cadaver dogs?

Deborah Hall, CCR - (501)230-3396

Electronically signed by debbie hall (301-121-347-5580)

2d7b61a0-b9df-459a-bb90-6f33fc3878d

1  saying that, "You have reason to believe that on the premises

2  located on the Gail Johnson Trust off of Sibley Trail in White

3  County --" and then you give the latitude and longitude --

4  "there are currently human remains, weapons, and other evidence

5  pertaining to the disappearance of Jarrod Green."

6      And based upon that affidavit Judge Derrick signed that

7  search warrant.

8      What did you have?

9      What did you have after investigating this matter for

10  several months that gave you reason to believe that located on

11  these premises there were human remains, weapons, and other

12  evidence?

13      What did you have?

14  A   The only thing I can remember having was the dogs and

15  speaking to Bobby O'Brien.  I know we spoke to Riley Daves.

16  Just things that lead us to that area.  I don't know for sure.

17  Q   Did the dogs go out before you got the warrant?

18  A   I believe so.

19      I don't remember how that come about.  I mean, we wouldn't

20  just walk onto somebody's land.  I know that we spoke with the

21  bank.  We had their permission to be on that property.  We went

22  ahead and did the search warrant.

23  Q   What was the point of the search warrant if the dogs had

24  already gone out there?

25  A   The search warrant was to -- I don't -- just to allow us

Deborah Hall, CCR - (501)230-3396

ctronically signed by debbie hall (301-121-347-5580)

2d7b61a0-b9df-459a-bb90-6f33fc3878d6

Page 39

1    to search.  You know, to break ground and --

2    Q    You actually took a backhoe out there?

3    A    I am not familiar with heavy machinery.  Yeah, a backhoe.

4    It helped us.

5         That was the second search warrant.  Yes, sir.  Oh, yeah,

6    the first one too, I am sorry.  The first one too.

7         We were going to attempt shovels, but it wasn't working

8    for us.

9    Q    Do you have in this investigation any type of direct

10   witness involving Mr. Wheeler's involvement in this -- in the

11   death of Mr. Green?

12   A    Being somebody that he told himself or?

13   Q    Something.  Yeah.  Something like that or somebody who saw

14   him do it.

15   A    No, sir.

16   Q    Not a thing?

17   A    No, sir.

18   Q    Do you have any other suspects?

19   A    Yes, sir.

20   Q    Who would they have been?

21   A    Robert Webb and Barron Stafford -- or Jessie Barron

22   Stafford.

23   Q    Robert Webb is Mr. Wheeler's roommate; is that correct?

24   A    Yes, sir.

25   Q    And the Stafford man is who?

Deborah Hall, CCR - (501)230-3396

ectronically signed by debbie hall (301-121-347-5580)

2d7b61a0-b9df-459a-bb90-6f33fc3878d6

Page 42

1    A    No, sir.

2    Q    Even though there wasn't any evidence found?

3    A    Yes, sir.  There was.

4    Q    What was that evidence again?

5    A    That was the scent of cadaver from the certified cadaver

6    dogs.

7    Q    And who says that?

8         Is there a report in the file that says that?

9    A    I don't know, sir.

10   Q    So --

11   A    Oh.  There is a report from the cadaver dogs, yes, sir.

12   Q    So that would have been corroborated if you would have

13   found anything out there, wouldn't it?

14   A    I don't know.

15        That is a big property.  I don't know that you could say

16   that.

17   Q    Well, the dogs just don't -- they don't walk up to one

18   piece of property and smell remains, and then you did over

19   there.

20   A    Well, sir, I am no expert with cadaver dogs, but we were

21   told that, you know, a dog could hit here and the scent be

22   streaming through vegetation and the body end up here.

23        Again, I am not an expert on that.  But, yes, sir, I do

24   believe that you could hit -- indicate here and dig here.  Yes,

25   sir, I do believe that.

               Deborah Hall, CCR - (501)230-3396

ctronically signed by debbie hall (301-121-347-5580)                    2d7b61a0-b9df-459a-bb90-6f33fc3878d6

Page 43

1   Q   And did you do that?

2   A   I don't remember exactly.

3      I know where we dug.  I don't remember if they hit here,

4  and we dug here.  I mean, we dug a large area of where they hit

5  and took advice from the handlers as to, you know, how far out.

6   Q   So you had -- you paid attention to the handlers, and they

7  tell you that the scent could evolve or emote from one place to

8  another place, and they will dig in that whole area; right?

9   A   Yes, sir.

10   Q   And they did that?

11   A   We did, yes, sir.

12   Q   You did that?

13      And you didn't find anything?

14   A   No, sir.

15   Q   Did you put that in the affidavit?

16   A   The arrest affidavit?

17   Q   Yeah.

18      Did you put that in there?

19   A   No.

20      Because we hadn't done the second one, I don't believe.

21  Yeah.  We made the arrest on the --

22   Q   Well, you told me the cadaver dogs had already been out

23  there.

24   A   Yes.

25   Q   They were certified cadaver dogs and they in fact were the

Electronically signed by debbie hall (301-121-347-5580)        2d7b61a0-b9df-459a-bb90-6f33fc3878d6

1   basis of this evidence that corroborated various sources in

2   this investigation.

3   A     Yes, sir.

4   Q     So you rely on that to get a warrant for Brandon's arrest.

5   A     Uh-huh.

6   Q     But you didn't have anything.

7         You dug where these dogs hit on the basis of what these

8   handlers said could be the geographic location, and you didn't

9   have anything.

10  A     Sir, we consider the scent of human remain evidence

11  according --

12  Q     You ever work drugs?

13  A     Yes.

14  Q     Did you ever work in drugs or you do in the traffic

15  division -- did you ever use the canine unit?

16  A     I used one through the county probably in 2013.

17  Q     Are they 100-percent right all the time?

18  A     I don't know, sir.

19        I have never handled one myself.

20  Q     Obviously, cadaver dogs aren't 100-percent right, or you

21  would have found something out there.

22        Now, what I want to know is why didn't you put in this

23  affidavit that the search of this property was unsuccessful?

24  A     I -- well, we weren't done searching when this affidavit

25  was written, sir.

Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)          2d7b61a0-b9df-459a-bb90-6f33fc3878d6

1   Q    You weren't done searching?

2   A    No, sir.

3   Q    When did you -- are you done searching now?

4   A    Yes, sir.

5   Q    Did you ever find anything?

6   A    No, sir.

7   Q    Do you think it would have been forthright to tell the

8   court despite the use of certified cadaver dogs, nothing was

9   found?

10       Do you think that would have been something you would have

11  wanted to include in this affidavit?

12  A    You could put it in there.  I don't think that I am

13  obligated to put it in there.  No, sir.

14  Q    Do you think that you are obligated to say that Witness 1

15  had recanted and been given a polygraph, and that he denied the

16  statement where Brandon Wheeler offered him money to take care

17  of Jarrod Green?

18       Do you think that should have been in there?

19  A    Sir, like I said, we spoke with the prosecuting attorney

20  when we were writing this affidavit, and she agreed that that

21  was -- that was how it needed to be structured.  She approved

22  that.

23       We told her he recanted.

24  Q    You told Becky --

25  A    Yes.

                Deborah Hall, CCR - (501)230-3396

Page 47

1   A    Brian Wyatt.

2        But, I mean, it was -- we thought he was there.  I think

3   it was Henderson, Nevada, actually.

4   Q    So Lieutenant Wyatt sent you to Las Vegas, and you found

5   out he wasn't there, and you turned around, and you go to Ohio?

6   A    We went to Pittsburgh first, Pennsylvania.

7   Q    Why?

8   A    That is where the US Marshals were, and I believe he was

9   kind of back and forth from Pittsburgh to Steubenville, I

10  believe.  Is that how you say it?

11  Q    And you-all had a warrant at that time; right?

12  A    Yes, sir.

13  Q    And why did the US Marshals get involved?

14  A    We requested their assistance in helping us track him

15  down, and they have better, you know, equipment for that, and

16  that is just what they do is they apprehend, and we sought help

17  from them.

18  Q    And you are aware at that point in time the judge had

19  issued a warrant.

20       You were going to go out and arrest Mr. Wheeler; is that

21  right?

22  A    Yes, sir.

23  Q    Were you told to obtain a confession from Mr. Wheeler?

24  A    That is -- that was our objective.

25  Q    I mean, did anybody tell you to --

Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)                    2d7b61a0-b9df-459a-bb90-6f33fc3878d6

Page 49

1  with her, let her know what we had, what we didn't have.

2  Q    And what did you have?

3  A    I don't remember at that time.

4  Q    What do you have today?

5  A    The same thing we had then.

6  Q    The same thing?

7  A    I mean, we are still working --

8  Q    This is it; right?

9       This is it?

10 A    Right now, yes, sir.

11 Q    This is it.

12      You have got a search that produced nothing.  You have got

13 an affidavit from Mr. Langley, who he recanted, and you have

14 got a -- you have got some illusion to a couple of missing

15 people, and one who committed suicide; is that correct?

16 A    I don't know.  I don't think that is correct, sir.  No,

17 sir.

18 Q    Did you ever submit anything to the crime lab, besides the

19 plant?

20 A    I think we did, but I don't remember -- it wasn't anything

21 that come back of any relevance, if we did.

22 Q    Did you ever -- did anybody ever do some sort of search of

23 the automobile upon its return?

24 A    What I remember, the vehicle -- are you talking -- are you

25 referring to Jarrod Green's?

                    Deborah Hall, CCR - (501)230-3396

1    Q    "This information indicated Jarrod Green's body was

2    disposed of at this location."

3         Tell me what you have to indicate that Jarrod Green's body

4    was disposed of at this location.

5    A    Just interviews that we did, information that we were

6    given.

7    Q    Who told you that Brandon Wheeler had dumped Jarrod

8    Green's body at that location?

9    A    Well, nobody witnessed him dumping the body.

10        If that is --

11   Q    I think that is probably true.

12        But who told you that the body had been dumped there?

13   A    We know Riley Daves -- I know Riley Daves did, and the

14   information Bobby O'Brien gave us led us out there.

15   Q    Some information that Bobby O'Brien --

16   A    Yes, sir.

17   Q    -- obtained from some informant?

18   A    Yes, sir.

19   Q    And you don't know who that informant is?

20   A    No, sir.

21   Q    And Riley Daves?

22   A    Yes, sir.

23   Q    Who is he?

24   A    He is a -- he has been around Searcy, my understanding,

25   for a long time.

                    Deborah Hall, CCR - (501)230-3396

1      To this place on --

2  A    I don't remember when that interview took place, so I

3  don't -- I really need to read the file before I could tell you

4  chronologically what happened.

5      I know that -- I don't remember if we were already out

6  there.  If we went to that pond after he told us, I don't

7  remember.  I do know that, you know, we interviewed him, and

8  that is what he told us.

9  Q    But you don't know when he told it to you?

10  A    I don't remember.  No, sir.

11  Q    Well, apparently he told it to you before you prepared

12  this affidavit; right?

13  A    Yes, sir.

14      This affidavit was prepared before we searched the pond.

15  Q    Well, and we are having a little trouble with that too,

16  Officer Sexton, because the cadaver dogs apparently were used

17  to find a scent is what you were basing the search warrant on.

18  A    Right.

19      What are you saying?

20  Q    I am saying that you searched the property with the

21  cadaver dogs before you got the search warrant.

22  A    Okay.

23  Q    Right?

24  A    I don't know.

25  Q    Am I right or wrong?

                    Deborah Hall, CCR - (501)230-3396

Page 55

1  A    I don't remember.  I really don't remember how we went out

2  there.  I know we spoke with the bank about the trust.

3      It seems like we -- the scent was the basis to getting the

4  search warrant.

5      So I don't remember why we were out there before or how we

6  got out there or who gave us permission or what.

7  Q    Got it.

8              MR. PETTY:  Anything else?

9              (conferring)  Just tell me.  Okay.

10  Q    And this is relatively important.

11      Did you read the interviews with Joey Blagg and Jason

12  Estes?

13  A    Yes, sir.

14  Q    Their interviews indicated that they had taken Jarrod's

15  vehicle to Walmart and left it there.

16      Are you aware of that?

17  A    It seems like it was the Food King parking lot.  I don't

18  remember it being Walmart, but I do remember that them -- there

19  being something with them two where Joey mentioned Jason.

20      And, of course, Joey is deceased, so I wasn't able to

21  interview him, but I remember something.

22      I do remember Jason appar -- from that information was to

23  have, like, either took his vehicle -- Jarrod's vehicle there

24  or brought it.  I don't remember the exact detail.

25      I do remember what you are talking about.

Page 58

1    statement was truthful?

2    A    Say again.

3    Q    You do believe that Charley -- pardon me, that Charles

4    Langley's initial statement was truthful?

5    A    I believe he had some information that he definitely

6    wouldn't know unless he had some knowledge or association, but

7    I don't know that it is completely truthful.

8         No, sir.

9    Q    Because, one, he did recant?

10   A    Yes, sir.

11   Q    And, two, he gave a polygraph --

12   A    Yes, sir.

13   Q    -- to verify his recanting.

14        And, three, when you told the prosecutor when you were

15   producing this affidavit that he had recanted, and she told you

16   to leave it.

17   A    Yes.

18   Q    That is all.

19   A    Okay.

20             MR. OHM:  No questions from me.

21             (WHEREUPON, the proceedings were concluded in

22        the matter at 1:18 p.m.)

23             (WITNESS EXCUSED)

24

25

                  Deborah Hall, CCR - (501)230-3396

lectronically signed by debbie hall (301-121-347-5580)                    2d7b61a0-b9df-459a-bb90-6f33fc3878d6

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

BRANDON LEE WHEELER                                          PLAINTIFF

VS.                    CASE NO. 4:18-cv-859-SWW


CITY OF SEARCY, ARKANSAS;                                    DEFENDANTS
ERIC WEBB, INDIVIDUALLY and in his official
capacity as CHIEF OF POLICE for the CITY OF SEARCY;
MARK KIDDER, INDIVIDUALLY and in his former official
capacity as a POLICE OFFICER and INVESTIGATOR with
and for the CITY OF SEARCY; ADAM SEXTON, INDIVIDUALLY
and in his official capacity as a POLICE OFFICER and
INVESTIGATOR with and for the CITY OF SEARCY;
NICK DARNELL, INDIVIDUALLY and in his official capacity
as a POLICE OFFICER and INVESTIGATOR with and for the
CITY OF SEARCY; CHARLEY PERRY, INDIVIDUALLY and in his
former capacity as a POLICE OFFICER and INVESTIGATOR with
and for the CITY OF SEARCY; and JOHN DOES 1-20, past and
present employees of the CITY OF SEARCY or the SEARCY POLICE
DEPARTMENT



ORAL DEPOSITION

OF

ERIC WEBB

TAKEN JUNE 19, 2019, AT 12:03 P.M.


Deborah Hall, CCR

1603 Rehoboth Drive

Searcy, Arkansas 72143

(501) 230-3396
dhall1914courtreporter@gmail.com

```
 1                    P R O C E E D I N G S
 2        THEREUPON,
 3                         ERIC WEBB,
 4             THE WITNESS HERINBEFORE NAMED, having
 5             been first duly cautioned and sworn by me
 6             to testify to the truth, the whole truth,
 7             and nothing but the truth, testified on his
 8             oath as follows, to-wit:
 9                         EXAMINATION
10    BY MR. PETTY:
11    Q    Eric, say your full name, please.
12    A    Robert Eric Webb.
13    Q    And, Eric, you were the chief of police for the Searcy
14    Police Department from when to when?
15    A    June of 2015 until November of 2018.
16    Q    And have you ever had your deposition taken before?
17    A    No, sir.
18    Q    We have a court reporter here, and she is going to take
19    down what I say and then what you say.
20              MR. PETTY:  Have you sworn him?  Did you swear
21         him?
22              THE COURT REPORTER:  (confirms)
23              MR. PETTY:  Okay.
24    Q    (By Mr. Petty)  And you are under oath, and you are -- I
25    am going to count on your answers as this is something that we
                   Deborah Hall, CCR - (501)230-3396
```

Page 8

1   Q    So who was the primary detective in conjunction with this

2   investigation?

3   A    I do not know who the primary detective was.

4   Q    What -- who would know that information?

5   A    The supervisor over the criminal investigation division or

6   Assistant Chief Taylor.

7   Q    And would they be one in the same?

8   A    No.

9   Q    Who would have been the chief of the investigators?

10       Who would that have been during your tenure?

11  A    I believe at that time it would have been Lieutenant Brian

12  Wyatt to the best of my recollection.

13  Q    And did they consult with you in conjunction with the

14  reopening of this case?

15  A    They asked if they could reopen it, and I said yes.

16  Q    Did they tell you why they had some interest in reopening

17  this case?

18  A    No, sir.  Not to my recollection.

19  Q    Were you a part of the interview of Charley Perry prior to

20  the reopening of this case?

21  A    No, sir.

22  Q    You know Charley?

23  A    I do.

24  Q    I think Charley was a police officer here for 19 or 20

25  years, maybe longer than that.

Deborah Hall, CCR - (501)230-3396

Deborah Hall, CCR - (501)230-3396

Page 9

1      Did you know that Mr. Perry was involved in a preliminary

2  interview or two prior to the reopening of this case?

3  A      No, sir.

4  Q      Did any of the officers or the supervising officer keep

5  you informed as to the progress of this investigation?

6  A      Not on a regular basis.

7  Q      Did you know anything about the application of search

8  warrants or affidavits for the warrant of Mr. Wheeler's arrest?

9  A      After the affidavit had been delivered to the prosecutor's

10  office, I was informed that an affidavit had been delivered and

11  a warrant had been issued.

12  Q      So after the affidavit had been delivered to the

13  prosecuting attorney and the affidavit had been signed by the

14  judge?

15  A      The warrant had been issued --

16  Q      The warrant had been signed by the judge, pardon me.

17      The warrant had been signed by the judge is when you

18  became aware of what was happening?

19  A      I think that contradicts what you had asked earlier.

20      Can you clarify for me.

21  Q      You didn't know the status of the case until the affidavit

22  was presented to the prosecuting attorney and the judge signed

23  the warrant?

24  A      Yes.

25  Q      Is that correct?

Deborah Hall, CCR - (501)230-3396

Deborah Hall, CCR - (501)230-3396