**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

BRANDON LEE WHEELER      *
                    PLAINTIFF      *
                                           *
V.                                         *
                                           *      CASE NO.  4:18CV00859 SWW
                                           *
CITY of SEARCY, ARKANSAS, ET      *
AL.                                       *
                    DEFENDANTS

**OPINION and ORDER**

Plaintiff Brandon Lee Wheeler ("Wheeler") brings this action under 42 U.S.C.

§ 1983, charging that his constitutional rights were violated when he was arrested for

capital murder and abuse of a corpse, charges that a prosecutor eventually dismissed by

*nolle prosequi*, with leave of court.  Wheeler names as  defendants Searcy Police

Department ("SPD") officers Mark Kidder ("Kidder"), Adam Sexton ("Sexton"), and

Nick Darnell ("Darnell"); former SPD police chief Eric Webb ("Webb"); and former

SPD officer and investigator Charles Perry ("Perry").  Wheeler sues each defendant in his

individual and official capacities.  Before the Court is Defendants' motion for summary

judgment [EFC Nos. 19, 20, 21] and Wheeler's response in opposition [EFC Nos. 24, 25,

26].  After careful consideration, and for reasons that follow, the motion for summary

judgment is granted in part and denied in part.

**I.  Summary Judgment Standard**

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

1

of law." Fed. R. Civ. P. 56(a).   As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)

The non-moving party may not rest on mere allegations or denials of his pleading but must come forward with 'specific facts showing a genuine issue for trial. *Id*. at 587. "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 401 (8th Cir. 1995).

## II.  Background

On October 5, 1994, David Green contacted the Searcy Police Department ("Searcy PD") to report that his twenty-year-old son, Jarrod Green ("Green"), had been missing since 8:00 p.m. on September 30, 1994.  A related SPD report stated:  "The complainant stated that his son had left the complainant's home to meet with a Brandon Wheeler, . . . because his son owed Brandon Wheeler money for drugs."[1]  After receiving the missing person report, the SPD began an extensive investigation into Green's

---

[1]ECF No. 21-1, at 22.

disappearance.  On September 17, 1995, almost a year after Green went missing, an

individual named Charles Langley ("Langley") provided the following statement:

> Sometime late last year, Brandon Wheeler and Jason Webb came to my
> house in Higginson.  They had come to sell me some crystal.  While there[,]
> they asked me if I wanted to get rid of someone for them because he owed
> them $7,500.  The guy they wanted to get rid of was [Jarrod][2] Green.
> Sometime later in December they came to my house again and said that Jason
> Green was no longer a problem, that he had been taken out of the picture.
> They told me that they had grabbed him at the [Walmart] store and took care
> of him.  Both . . . guys used to get at [a lot] of guns from the Higginson gun
> store.  They would deal with the son of the store owner.  Later they talked
> about getting rid of this guy[,] and I told them that I didn't want anything to
> do with them.[3]

SPD officers concluded that Jarrod Green was deceased and that Wheeler had murdered

him, but they did not pursue charges because evidence was lacking.

On March 9, 2000, Defendant Perry, then an SPD officer, interviewed Langley,

who recanted his September 17, 1995 statement.  At the time, Langley was imprisoned at

the St. Francis County Jail, and he provided Perry the following statement:

> I knew the reason for Det. Perry coming . . . [,] and it was about Jarrod Green,
> the boy that came up missing in 1994.  He asked me if I could tell him about
> . . . people I was dealing with around that time and why I said that I could
> shed some light on Jarrod being missing.  I told Det. Perry that I was on my
> way to prison at the time that I made the statement . . . [,] and most of what I
> told him was stuff that was being spread around the drug community.  I
> explained that I did not even know the guys, meaning Brandon Wheeler and
> Robert Webb, at the time that Jarrod came up missing.  I had my first dealings
> with Wheeler and Webb either in late 1994 or early 1995.  The two were
> always carrying guns and at one point in early ['95] they had left a Glock 45
> at my house for several days.  The statement that I [made in 1995] was an

---

[2]Charles Langley's handwritten statement dated September 17, 1995 refers to "Jason Green," not
Jarrod Green.
[3]ECF No. 21-1, at 23.

attempt to shorten my stay or possibly even keep me from going to prison, but most of which was a lie.[4]

In November 2016, Defendants Kidder, Darnell, and Sexton (collectively, "the officers") reopened Green's missing person case. Defendant Webb, then the SPD police chief, gave the officers permission to reopen the case. Investigative notes record that the officers interviewed Langley a third time,[5] and once again, Langley recanted the statement he had provided on September 17, 1995.[6]

The officers suspected that Green's remains were present at a rural property, which they searched on December 13, 2016, using a certified cadaver dog named "Gunner." A "mission report" documenting the search stated that Gunner was "brought to the point last seen and allowed to take inventory of the odors in the area prior to being scented,"[7] indicating that a dog handler exposed Gunner to Green's sent before the search proceeded. The mission report recorded that Gunner showed repeated interest in a spot near an old deer stand, an area that had been described by a confidential informant.[8] On December 17, 2015, the officers searched the property with additional certified cadaver dogs, Savvy and Shy, who both reacted to the same spot where Gunner had shown an

---

[4]ECF No. 19-1, at 24.
[5]A copy of the investigative notes indicate that Langley's third interview took place on December 5, 2017, *see* ECF No. 25-1, at 6, but Plaintiff's statement of disputed facts state that that the interview took place on December 5, 2016, ECF No. 25, at 3. Langley also submitted to a computerized voice stress analysis ("CVSA") on March 28, 2017, and investigative notes state that "Arkansas State Police SSA Scott Clark . . . determined Langley to be telling the truth, though he cited slight deception on one question (are you withholding information from law enforcement)." ECF No. 25-1, at 6. The Court is without information as to the questions posed to Langley during the CVSA.
[6]ECF No. 25-1.
[7]ECF No. 21-1, at 28.
[8]ECF No. 21-1, at 29.

interest.   The search extended to a pond on the property, which was drained, but physical evidence of human remains was *never* found.

During the reopened investigation, the officers consulted prosecuting attorney Rebecca Reed McCoy ("McCoy"), and she reviewed  evidence and information that the officers had gathered.  Officer Sexton prepared a sworn  affidavit for Wheeler's arrest for capital murder and abuse of a corpse, which he signed on March 28, 2017.  At some point, McCoy reviewed the affidavit and made corrections and changes, and she, along with the officers, appeared before White County Circuit Court Judge Robert Edwards to request an arrest warrant.  Sexton's  affidavit read as follows:

> On Wednesday, October 5, 1994 David Green made a missing [person] report with the Searcy police Department.  Mr. Green reported his 20-year old son, Jarrod Devlin Green, left his home of [address redacted] in Searcy, AR on September 30, 1994 to meet Brandon Wheeler in relation to a drug debt owed to Mr. Wheeler.  Mr. Green explained [that] shortly before this report[,] Jarrod Green's vehicle had been located in the Searcy, AR Wal-Mart parking lot with the windows down and the keys in the floorboard. Mr. Green said Jarrod Green had not been seen or heard from by anyone since September 30, 1994.
>
> On Wednesday, November 2, 2016, I, Detective Adam Sexton, Detective Mark Kidder, and Detective Nick Darnell re-opened this case for further investigation. During . . . this investigation[,] there have been many witnesses interviewed [about] Jarrod Green's disappearance. Witnesses [who] were interviewed agreed that there was a conflict between Brandon Wheeler and Jarrod Green[,] which concerned a debt owed to Mr. Wheeler by Jarrod Green.
>
> On July 17, l995[,] Witness 1 [Charles Langley] made a statement both verbally and in written form to Law Enforcement. Witness 1 stated he was approached by Brandon Wheeler and Wheeler's roommate in 1994, prior to Jarrod Green's disappearance and offered one thousand ($1,000.00) dollars to get rid of Jarrod Green.  After Jarrod Green's disappearance[,] Brandon Wheeler and his roommate came back to Witness 1 and stated Jarrod Green had been done away with. Witness 1 also provided details about Brandon

Wheeler and his roommate grabbing Jarrod Green at the Wal-Mart Super Center store parking lot.   Original police reports show Jarrod Green's vehicle was found at the Wal-Mart Super Center parking lot.

On December 8, 2016[,] myself (Detective Sexton), along with Detective Mark Kidder, and Detective Nick Darnell interviewed Witness 2 at the Branson Police Department in Branson, MO.   Witness 2 explained on the night of Jarrod Green's disappearance, he met with Jarrod at the Searcy Country Club parking lot per Jarrod Green's request. Witness 2 explained at that . . . time[,] he possessed Jarrod Green's .38 Rossi revolver.   Witness 2 went on to say when Mr. Green arrived[,] he requested he have his revolver back due to a meeting he was about to have with Brandon Wheeler.   Witness 2 said Jarrod Green told him he needed his gun for protection against Brandon Wheeler.   Witness 2 said after he gave Jarrod Green his gun[,] he told Jarrod to be careful and then left the area.   Witness 2 provided a written statement that will be retained in this case file.

On December 13, 2016[,] a written statement was obtained from Witness 3.   Witness 3 said [that] shortly before Jarrod Green went missing, Jarrod left home to get away from who she believed to be Brandon Wheeler.   Witness 3 said about a week before Jarrod Green went missing[,] he received a phone call telling him he had nothing to worry about and that no one was after him anymore.   Witness 3 stated Jarrod then came back home to Searcy, AR and stayed at his parent's residence.   Witness 3 stated approximately one week later[,] Jarrod went missing. Witness 3 provided a written statement that will be retained in this case file.

On December 14, 2016[,] myself (Detective Sexton) and Detective Mark Kidder interviewed Witness 4 at the Searcy Police Department in Searcy, AR. Witness 4 explained [that] she and Jarrod Green were in a relationship at the time of his disappearance.   Witness 4 said Jarrod Green begged her to come along with him on the night he went missing. Witness 4 said Jarrod Green was acting out of character during her conversation with him. Witness 4 said Jarrod Green was crying and begging her to come with him. Witness 4 said she opted not to go with Jarrod Green and never [saw] or heard from him since that phone call.   Witness 4 provided a written statement that will be retained in this case file.

On December 14, 2016[,] Detective Mark Kidder obtained a written statement from Witness 5.   Witness 5 explained he was [a friend of] Jarrod Green during the time that Jarrod went missing.   Witness 5 said that about a week or two before Jarrod went missing, Jarrod approached him at his residence in Jonesboro, AR.   During the conversation between Witness 5

and Jarrod Green, Jarrod said Brandon Wheeler fronted him a lot of "dope." Witness 5 said Jarrod Green told him he did not have any intention to pay Brandon Wheeler back due to being "ripped off" by Brandon Wheeler so many times before. Witness 5 said this was the last time he saw Jarrod Green.

Approximately ten (10) months later, after the disappearance of Jarrod Green, Brandon Wheeler's roommate and best friend was reported as a missing person by his mother. Reference Case number 97-12-563. An investigator reported during this time, the aforementioned individual was bragging he was a part of the disappearance of Jarrod Green, just before his own disappearance.

On December 31,2000 another close friend and roommate of Brandon Wheeler, who was also good friends with Jarrod Green during the time of Jarrod Green's disappearance, committed suicide. Prior to committing suicide, this subject gave disclosure of two separate murders to his cousin who was also his pastor.

On December 19, 2016, a search was signed by a judge for property of interest in connection with this case in rural White County Arkansas. From December 20, 2016 through December 23, 2016[,] the aforementioned uninhabited property was searched due to evidence found confirming information obtained from various sources in this investigation. This information indicated Jarrod Green's body was disposed of at this location. Certified Cadaver dogs were used successfully in locating the aforementioned evidence.

I, therefore, request a warrant be issued for Brandon Lee Wheeler, for Capital Murder in violation of [Arkansas Code] § 5-10-101[,] a Class Y Felony, [and] Abuse of a Corpse, [in violation of Arkansas Code] § 5-60-101, a Class C Felony.

This case is under investigation.[9]

On April 6, 2017, Judge Edwards issued a warrant for Wheeler's arrest on the

charges of capital murder and abuse of a corpse, and on May 10, 2017, McCoy issued an

information charging Wheeler with capital murder and abuse of a corpse. Thereafter,

---

[9]ECF No. 19-1, at 48-50.

Wheeler was arrested in Ohio, interrogated, and transported to Arkansas, where he was detained.  On June 5, 2017, Wheeler was released on bail, and on November 9, 2017, McCoy moved to *nolle pros* the charges against Wheeler, for the stated reason that "additional is evidence expected to be recovered and DNA testing would not be completed within the time frames set by the Court."[10]   By affidavit, Steve Taylor, who served as the SPD assistant chief at the time, testifies:  "Following the draining of the pond and the inability to secure DNA testing in a timely manner, prosecuting attorney, Rebecca Reed McCoy, made the decision to *Nolle Prosequi* these charges for further investigation."[11]

## III.  Discussion

With his complaint, Wheeler charges that he was unlawfully arrested, interrogated, and imprisoned based on either lies or recklessness on part of the defendant officers.  He alleges that a month after his arrest, he was released on bond but forbidden to leave Arkansas, which caused him to suffer lost wages and severe mental anguish and suffering.

Wheeler seeks damages under 42 U.S.C. § 1983, charging that Defendants caused him to suffer the following constitutional deprivations:  (1) unreasonable seizure, in violation of the Fourth and Fourteenth Amendments; (2) deprivation of liberty and property without due process, in violation of the Fourteenth Amendment; (3) deprivation of the right to a speedy trial, in violation of the Sixth Amendment; and (3) cruel and

---

[10]ECF No. 19-1, at 53.
[11]ECF No. 19-1, at 7-8.

unusual punishment and excessive bail, in violation of the Eighth Amendment.[12]
Wheeler sues defendants in their official and individual capacities, and his official-capacity claims are claims against the city of Searcy, Arkansas. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Wheeler also brings supplemental claims under the Arkansas Civil Rights Act and a claim for intentional infliction of emotional distress under state tort law.

Defendants move for summary judgment arguing that (1) Wheeler's arrest was supported by probable cause, (2) the officers sued in their individual capacity are entitled to qualified immunity, and (3) Wheeler's supplemental claim for intentional infliction of emotional distress fails as a matter of law.

### A.  Individual-Capacity Claims for Unreasonable Seizure

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727 (1982).  In determining whether a defendant is entitled to qualified immunity, a court examines (1) whether the facts alleged or shown, construed most favorably to the plaintiff, establish a violation of a constitutional right and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful. *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013)(citation omitted).

---

[12]The parties do not reference Wheeler's Sixth and Eighth Amendment claims, and it is not clear whether he has abandoned these claims.

"The first step in any [§1983] claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 811–12, 127 L. Ed. 2d 114 (1994)(citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S. Ct. 1865, 1870 (1989).  Here, Wheeler appears to claim that his arrest and pretrial detention violated several constitutional rights, including his right to due process.  However, a claim for relief under § 1983 based on a pretrial deprivation of liberty is governed by the Fourth Amendment's prohibition of unreasonable seizures.  *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017)(holding that the Fourth Amendment governs a claim for unlawful pretrial detention, even beyond the start of legal process).

"The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111–12, 95 S. Ct. 854, 862 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964) (internal quotation marks omitted)).  An arrest warrant normally confers a "shield of immunity" to officers acting within its scope because "the fact that a neutral magistrate . . . issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235, 1245 (2012) (quoting *United States v. Leon,* 468 U.S. 897, 922–923, 104 S. Ct. 3405 (1984)).  But the fact that an arrest warrant issued in this case does not end the inquiry.  "'Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest violate the Fourth

Amendment, but the officer will not be entitled to good faith immunity.'" *Small v. McCrystal*, 708 F.3d 997, 1006–07 (8th Cir. 2013) (quoting *Myers v. Morris,* 810 F.2d 1437, 1457 (8th Cir.1987), *abrogated on other grounds by Burns v. Reed,* 500 U.S. 478, 111 S. Ct. 1934 (1991)).  Under such circumstances, officers may still be entitled to qualified immunity "'if all the false and reckless portions of a warrant affidavit are corrected and the corrected affidavit still supports a finding of probable cause.'" *Id.* (quoting *Bagby v. Brondhaver,* 98 F.3d 1096, 1099 (8th Cir.1996)).

Defendants contend that Wheeler's primary complaint is that the warrant affidavit underlying his arrest should have stated that Langley had recanted his original statement that implicated Wheeler in Green's disappearance.  Defendants argue that even if all information about Langley's statement were stricken from the affidavit, the remaining testimony supplied probable cause for an arrest warrant.  Wheeler, however, contends that the probable cause affidavit contains *two* glaring omissions:  (1) that Langley completely recanted his September 17, 1995 statement[13] and (2) that the December 2017 cadaver-dog searches uncovered no evidence of human remains or evidence connected to Green.

---

[13]Langley recanted his original statement for the most part, but not completely.  In March 2000, Langley renounced the portion of his original statement implicating Wheeler, and he said that "most" of his original statement was a lie.  A portion of the original statement contained information that corroborated facts in Green's missing person case.  For example, Langley's original statement included that Wheeler and Webb told him that they grabbed Green at Walmart and "took care of him," which corroborated the fact that Green's car was discovered abandoned in the Walmart parking.

It is undisputed that Sexton, Kidder, and Darnell knew that, contrary to the warrant affidavit, Langley had renounced his initial statement and that Green's body was never recovered.  Also undisputed is that the officers appeared before Judge Edwards and sought a warrant for Wheeler's arrest based on Sexton's affidavit.  Importantly, the warrant affidavit is the sole evidence submitted in this case regarding evidence that was presented to Judge Edwards before he issued the arrest warrant.  Defendants report that McCoy and the officers "visited with . . . Judge . . . Edwards and discussed with him the issue of whether . . . there was probable cause to issue a bench warrant to arrest Brandon Wheeler."  However, the record is void of evidence regarding the content of the "discussion" before Judge Edwards.

The portion the warrant affidavit that described Langley's initial statement was arguably crucial to a finding of probable cause.  Additionally, the affidavit falsely indicated that cadaver dogs had located Green's remains.  The undisputed facts confirm that such was not the case.  Although the cadaver dogs showed an interest in the area around a deer tree stand, the dogs *did not* recover physical evidence of a dead body, and human remains were never found.

After removing the paragraph describing Langley's incriminating statement and the paragraph indicating that Green's remains had been recovered, the warrant affidavit contains the following pertinent information:  (1) On October 5, 1994, Green's father reported that his twenty-year-old son, Jarrod, had been missing since September 30, 1994, when he left home to meet Wheeler about a drug debt; (2) after Green went missing, his abandoned vehicle was discovered at the Walmart parking lot, with the

12

windows down and the keys in the floorboard; (3) the night of his disappearance, Green obtained his revolver from a friend and stated that he was going to meet with Wheeler and needed the weapon for protection; (4) weeks before Green went missing, he left home in order to avoid someone, who Witness 3 "believed to be Brandon Wheeler[,]" but Green returned home after receiving a phone call, telling him "he had nothing to worry about and that no one was after him anymore[,]" and Green went missing two weeks after he returned home;  (5) the night that Green disappeared, he talked to his girlfriend and, acting out of character, he cried and begged her to "come with him"; and (6) approximately one week before Green went missing, he told a friend that he owed Wheeler money for "dope" but had no intention of paying the debt.  The affidavit also includes vague information about the disappearance of Brandon Wheeler's roommate and best friend, who had allegedly bragged about his involvement in Green's disappearance, and the suicide of another friend of Wheeler, who told his cousin, a pastor, about two murders.

"For probable cause to exist, there must be probable cause for all elements of the crime . . . . " *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1312 (8th Cir. 2014)(citing *Kuehl v. Burtis,* 173 F.3d 646, 651 (8th Cir.1999)(holding that an officer who ignored exculpatory evidence that negated the *mens rea* required for assault was not entitled to qualified immunity for arrest without probable cause).  In a homicide case, the *corpus delicti* consists of proof that the victim died and that the death was caused by a

criminal act of another person. [14]  Although a dead body is not required, there must be circumstantial evidence that there was in fact a death caused by the criminal agency of another. *Derring v. State*, 273 Ark. 347, 353, 619 S.W.2d 644, 647 (1981).

Here, the warrant affidavit did not establish that Green was a person of strict routine or that he normally kept his family apprised of his whereabouts.  In fact,  the affidavit stated that for a period before Green's disappearance, he had left home to hide from someone, and the day of his disappearance, he begged his girlfriend to "come with him."  After editing out the incomplete and false portions of the warrant affidavit, the remaining information was insufficient to establish that Green was dead and that his death was caused by the criminal act of another person.  Accordingly, the Court finds that Sexton, Kidder, and Darnell are not entitled to qualified immunity as to Wheeler's claim that he was arrested and detained without probable cause.

In contrast, the Court finds no genuine issues for trial as to Wheeler's claims against separate defendants Perry and Webb.  There is no *respondeat superior* liability in § 1983 actions, and defendants sued in their individual capacities are personally liable only for their own misconduct. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978); *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).  Wheeler alleges no facts and provides no evidence that Perry had any role in the reopened investigation or events

---

[14]Under Arkansas law, a person commits capital murder if acting alone or with one or more other persons, "with the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person."  Ark. Code. Ann. § 5-10-101(a)(4).

that lead to Wheeler's arrest, and the Court finds that he is entitled to summary judgment in his favor.

Wheeler seeks to hold Webb liable under a failure-to-supervise theory, reasoning that he gave the officers permission to reopen the missing person case, solely because the they asked, and he failed to monitor the reopened investigation.  A supervisor can be liable for a subordinate's constitutional  violation only "'if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.'"  *Otey*, 121 F.3d at 1155 (quoting *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994)).  When, as here, a supervising officer had no participation in an alleged constitutional violation, he is entitled to qualified immunity unless the plaintiff proves that he (1) received notice of a pattern of unconstitutional acts committed by the subordinate, and (2) authorized or demonstrated deliberate indifference to those unconstitutional acts. deliberately indifferent to or authorized those acts. *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)(citing *Livers v. Schenck,* 700 F.3d 340, 355 (8th Cir. 2012)).  Here, the record is void of evidence that Webb was deliberately indifferent to or tacitly authorized unconstitutional acts, and the Court finds that he is entitled to qualified immunity and summary judgment in his favor.

### B.  Official-Capacity Claims

Wheeler claims that the City's failure to properly train its officers caused his alleged constitutional deprivations.  To establish municipal liability under a failure-to-train theory, a plaintiff must prove that the failure to train in a relevant respect demonstrated "deliberate indifference" to his constitutional rights. *City of Canton*

*v. Harris*, 489 U.S. 378, 389 (1989); *Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir.1996).

Deliberate indifference in this context is a stringent standard of fault, requiring proof the

City had notice that its procedures were inadequate and likely to result in a violation of

constitutional rights. *See id*. Notice may be implied when (1) the failure to train is so

likely to result in a constitutional violation that the need for training is patently obvious

or (2) a pattern of misconduct indicates that the current training is insufficient to protect

citizens' constitutional rights. *See Id*.

The City submits undisputed evidence that each defendant received basic law

enforcement training and that at all relevant times, the City's policies required that

officers had probable cause for making an arrest and provided accurate and complete

information in seeking an arrest warrant.  Wheeler, on the other hand, fails to come

forward with a single fact showing that the City had notice that its training procedures

were inadequate and likely to result in wrongful arrest.  The Court finds that the City is

entitled to summary judgment.

### C.  Intentional Infliction of Emotional Distress

Under Arkansas law, a claim for intentional infliction of emotional distress, also

known as outrage, has four elements: (1) the defendant intended to inflict emotional

distress or should have known that emotional distress was the likely result of its conduct;

(2) the defendant's conduct was extreme and

outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized

community; (3) the defendant's conduct caused the plaintiff emotional distress; and (4)

16

the plaintiff's emotional distress was so severe that no reasonable person could be expected to endure it.  *Crockett v. Essex*, 341 Ark. 558, 563-64 (2000).

Defendants move for summary judgment on Wheeler's outrage claim, asserting that the warrant affidavit contained no falsehoods and established probable cause to arrest Wheeler.  For reasons previously stated, the veracity of the warrant affidavit at issue is questionable, and when the inaccurate portions are redacted, the remaining content does not support a finding of probable cause.  Wheeler contends that  resolution of his outrage claim requires credibility determinations and weighing of evidence by a jury, and the Court agrees.  *Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 560 (8th Cir. 1989)(finding that evidence of detention, search, and prosecution for shoplifting without probable cause "smacks of exactly the type of 'intentional infliction' to which this cause of action refers").

## III.

For the reasons stated, Defendants' motion for summary judgment [ECF No. 19] is GRANTED IN PART AND DENIED IN PART.  The motion is granted to the extent that Plaintiff's claims against Separate Defendants Eric Webb,  Charles Perry, and the City are DISMISSED WITH PREJUDICE.  The motion is denied in all other respects.

IT IS SO ORDERED THIS 27th DAY OF MAY, 2020.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE